# UNITED STATES DISTRICT COURT
for the
District of New Mexico

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

2023 JUL 11 PM 3:31

CLERK-LAS CRUCES

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>**7991 Grouse Run Dr.**<br>**Las Cruces, New Mexico 88012**<br>**(Subject Premises)** | )<br>)<br>)  Case No. 23MR1372<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, attached and fully incorporated herein.

located in the _____ District of ___New Mexico___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, attached and fully incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841 | Possession with Intent to Distribute a Controlled Substance |
| 21 U.S.C. 846 | Conspiracy to Possess with Intent to Distribute a Controlled Substance |

The application is based on these facts:
See Attachment C, attached and fully incorporated herein.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Rene Robles, HSI Special Agent
*Printed name and title*

Electronically submitted and telephonically sworn to before me:

Date: 11 July 2023

City and state: Las Cruces, NM

*Judge's signature*

Damian L. Martinez, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

## DESCRIPTION OF PROPERTY TO BE SEARCHED

The premises to be searched (the "Subject Premises") is located at 7991 Grouse Run Dr, Las Cruces, NM 88012. The Subject Premises is a property with a residence located on the corner of Blue Topaz ave. and Grouse Run Dr. in Las Cruces, New Mexico. The residence runs north to south, with the main entrance facing the east. The residence has blue siding, white window frames, and a tan singled roof. The residence has a garage on the southeast corner, and the property is partially surrounded by a chain-link fence. The chain-link fence around the property features a taller gate with solar powered lights attached at the top which blocks the main entry to the rest of the property, off of Grouse Run Drive.

To include all outbuildings, trailers, and appurtenances on the property, and all vehicles on the property associated with Juan Madrid-Pinon.

Below are three pictures of the Subject Premises.







## ATTACHMENT B
## ITEMS TO BE SEIZED

Evidence of violations of 21 U.S.C. §§ 841 and 846 by Juan Madrid-Pinon, including:

1. Any cellular telephones, digital tablets, personal digital assistant (PDA) devices or other communication devices and any and all information stored on such communication devices, including:

    a. Phone numbers, names, usernames, email addresses, residential addresses, and other identifying information of customers, distributors, sources of supply, and other associates of the user of the communication devices;

    b. Audio and video calls made to or from the communication devices, along with the duration and date and time each such communication occurred;

    c. Any message logs or messages, whether sent from, to, or drafted on the communication devices, along with the date and time each such communication occurred;

    d. The content of voice mail messages and audio and video messages stored on the communication devices, along with the date and time each such communication occurred;

    e. Photographs or video recordings;

    f. Information relating to the schedule, whereabouts, or travel of the user of the communication devices;

    g. Information relating to other methods of communications, including the contents of those communications, utilized by the user of the communication devices and stored on the communication devices;

    h. Bank records, checks, credit card bills, account information and other financial records; and

    i. Evidence of user attribution showing who used or owned the communication devices, such as social media accounts, email addresses, messages, location information, photographs and videos, phonebooks, saved usernames and passwords, documents, and internet browsing history;

2. Records relating to the importation, distribution, and possession of controlled substances, including, but not limited to books, records, receipts, cell phones, cell phone records, notes, ledgers, notebooks, border crossing documents, designated codes and other papers

relating to the transportation, ordering, purchase and distribution of controlled substances including but not limited to cocaine;

3. Papers, tickets, notes, schedules, receipts including bill of sales for vehicles, registration and licensing of vehicles, license plates, vehicle titles, registration, documents, stickers, and other proof of ownership and tax compliance, driver's license, or proof of insurance and liability;

4. Financial documents, including but not limited to, credit card statements, tax returns, safe deposit records, safe deposit keys, bank records, bank statements, money orders, Western Union receipts, checking account records, cashier's checks, passbooks and other items evidencing the obtainment, concealment and/or expenditure of money or assets;

5. Identification and personal records including address books, telephone directories, calendars, diaries, social security cards, lists of names, social security numbers and other personal identification, telephone and address books or papers of individuals involved in the trafficking of controlled substances;

6. Photographs, video recordings, slides, digital files, DVDs, CD-Rs, or other media containing images or video of individuals involved in the trafficking of controlled substance which demonstrate his/her involvement in drug trafficking as well as other notes, records, diaries, journals, emails, blog entries, which demonstrate involvement in drug trafficking;

7. Proceeds of an unlawful activity, including but not limited to, United States currency, jewelry, vehicles and other assets or financial records related thereto;

8. Documents, books and papers reflecting names, addresses and/or telephone numbers and lists pertaining to individuals involved in the trafficking of controlled substances, including but not limited to cocaine;

9. Diaries, purchase records, cash receipts and disbursement journals, inventory records and other records relating to the operation of controlled substance sales, repackaging, and redistribution in violation of 21 U.S.C. 841 and 846;

10. United States currency, currency counting machines, precious metals, jewelry, financial instruments including stocks and bonds, and all other items of value, and all sales receipts for items of value, that evidence the proceeds from the smuggling, transporting or distribution of drugs.

11. Devices or objects utilized to account for proceeds related to violation of violation of 21 U.S.C. §§ 841 and 846, including but not limited to currency counting machines;

12. Controlled substances, drug paraphernalia, and packaging materials, including scales, plastic baggies, vacuum sealing machines, and tape;

13. Firearms and ammunition as defined by Title 18 USC Section 921;

14. Valid or false identification documents, including drivers' licenses, social security cards, state identification cards and foreign identification documents;

15. Bills, notes, contracts, or other documents reflecting the ownership, subscription information or use or control of one or more telephones or the location to be searched;

16. Tools utilized in the alteration of motor vehicles to facilitate transporting narcotics in violation of 21 U.S.C. §§ 841 and 846; and

17. Safes, lock boxes, or other locked containers, in which the items in paragraphs 1 through 16 could be concealed.

ATTACHMENT C

AFFIDAVIT IN SUPPORT OF ORDER AUTHORIZING
SEARCH WARRANT

I, Rene Robles, being first duly sworn, hereby depose and state as follows:

1. This Affidavit is submitted in support of an order authorizing the entry into the Subject Premises, as more fully described below and in Attachment A to the Search Warrant Application, for the purposes of searching and seizing evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846 (distribution and possession with intent to distribute a controlled substance and conspiracy to do the same) more fully described in Attachment B.

Introduction

2. I am a Special Agent (SA) of the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and am currently assigned to the Las Cruces Strike Force (LCSF) with the Drug Enforcement Administration (DEA) in Las Cruces, New Mexico. Prior to being employed with HSI, I was a Border Patrol Agent with the United States Border Patrol (USBP) for over ten years. I have been employed with HSI since January of 2019. During my tenure with HSI, I have attended more than six months of investigative training at the Federal Law Enforcement Training Center in Glynco, Georgia. I have received specialized training regarding the controlled substances act, drug smuggling, drug classifications, and Title 21 laws regarding manufacture, distribution, or possession of a controlled substance. My duties include, but are not limited to, the investigation and seizure of controlled substances illegally imported into the United States. Additionally, I have conducted investigations involving money laundering, hostage-taking and kidnapping, human smuggling, and firearms violations. As such, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2507(7) and am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

RR

3. My experience as a Special Agent includes, but is not limited to, conducting physical surveillance, interviewing witnesses, writing affidavits for, and executing, extradition warrants, search warrants, GPS tracking orders, arrest warrants, seizure warrants, working with undercover agents and informants, issuance of administrative and federal grand jury subpoenas, analysis of phone tolls and financial records, and analysis of data derived from the use of pen registers, and trap and traces.

4. Through my training and experience, I know the following:

    a. Drug traffickers commonly keep books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase, and distribution of controlled substances.

    b. Drug traffickers often amass large amounts of profits derived from their illegal drug trafficking activities. Documents and other records pertaining to assets which are proceeds of the drug trafficking described herein would constitute evidence of the same drug trafficking.

    c. Drug traffickers often maintain large amounts of U.S. currency derived from illegal activities.

    d. Drug traffickers often maintain ledgers, account books and other papers detailing the receipt, storage, sale, and distribution of drugs. These ledgers often contain amounts of drugs obtained by the organization, and accounting of payments of drug proceeds, including accounts receivable and accounts payable.

    e. Drug traffickers often maintain phone books, address books and other papers containing names, telephone numbers, and addresses of suppliers and purchasers of drugs. Drug traffickers will often write these documents in code and they maintain documents containing the key to their codes.

    f. Drug traffickers also often maintain documents or receipts for various services, such as bank statements, telephone bills, utility bills, vehicle repair, consumer goods purchases, all evidencing the disposition of illegal profits, the existence of "stash houses," and the existence of other assets derived from drug proceeds. Drug traffickers often maintain various documents evidencing ownership of assets such as real estate deeds, vehicle titles, and insurance policies.

RR

g. Drug trafficking is a "for profit business" and, as such, traffickers must maintain the types of documents described above so as to determine profitability and to track debts owed by and to the trafficker.

h. Drug traffickers often keep photographs and videos of themselves and their co-conspirators, drugs, and their illegal profits.

i. Drug traffickers often use surveillance cameras in and around their residences and locations where drugs are stored to detect law enforcement and to protect drugs and drug proceeds. These surveillance cameras can be capable of storing footage within the camera or on a separate storage device.

j. Drug traffickers often maintain safes or deposit boxes where they store drugs, U.S. currency and other documents evidencing their drug trafficking. It is common knowledge that safe deposit boxes require the owner to keep the key to the safe deposit box.

k. Drug traffickers often have in their possession firearms and ammunition to protect themselves, their drugs and the proceeds derived from the distribution of drugs from individuals who seek to rob them or from competing drug traffickers.

l. Drug traffickers often maintain one or more cellular or "smart" telephones ("devices") which they utilize to further their drug trafficking. Drug traffickers use these devices to communicate operational directives and information concerning the conduct of the organization's illegal activities to other organization members, including their suppliers, distributors and other co-conspirators. I know, based upon my training and experience, that timely communication of information between organizational members is critical to the overall success of an organization's illegal activities. The critical nature of this information is derived from the necessity of the organization's management to provide instructions for the importation, storage, transportation, and distribution of drug, as well as the subsequent laundering of the proceeds of these illegal activities.

RR

m.  I also know that some devices utilize subscriber identity module ("SIM") cards. A SIM card is a chip that is used to authenticate a device to a network. The SIM card generally contains subscriber information and authentication information, and it may contain contacts and encryption information. The portability of SIM cards in some devices allows a user to easily change devices, while maintaining the same telephone number, by removing the card from one device and inserting it into another. While SIM cards may have the capability to store some of the evidence described above, the storage capacity of devices tends to far exceed that of SIM cards. Which information is stored on the SIM card, on the device, or in both locations varies and depends on variables such as the user-defined settings on the device and the memory capacity of the SIM card. Accordingly, information pertaining to drug trafficking activity may be located on the SIM card itself, as well as the device in which the SIM card was inserted.

n.  I further know from my training and experience that a cache of information including dialed, received or missed calls and messages sent, received or placed in draft status, can be found on these devices. I know that the identities and telephone numbers of other participants in the drug trafficking activity are maintained in the contact lists of these devices. In my experience, drug traffickers also use these devices to take and store photographs or video recordings of themselves with their co-conspirators and with contraband, including drugs, currency and firearms. Drug traffickers also use the GPS or location applications of these devices, which can reveal their whereabouts when they conducted or arranged drug related activities or travel. In addition, drug traffickers also use these devices to store information related to the financial transactions that occur during the course of their drug trafficking, such as drug ledgers and financial accounts and transactions. In my experience, the devices used by drug traffickers often contain evidence relating to their drug trafficking activities, including, but not limited to, contact lists, lists of recent call activity, stored text and voice mail messages, photographs and video recordings, GPS and location

*RR*

information, and financial accounts and records. Information stored within a mobile device may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element, or, alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a mobile device (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the mobile device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. Information stored within a mobile device may provide relevant insight into the device user's state of mind as it relates to the offense under investigation. For example, information within the mobile device may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the mobile device or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

o. Drug traffickers often maintain drugs, drug proceeds, ledgers and other documents related to drug trafficking, and firearms, in their primary residence or place of business and in their vehicles to afford them ready access to those items.

p. Drug traffickers often conceal drugs, drug proceeds, firearms, and ammunition on the curtilage of their property, including buried underground and inside of vehicles, garages, storage sheds, recreational vehicles, and other unattached buildings, in order to prevent law enforcement or individuals who seek to rob them from discovering such items.

q. Drug traffickers often place ownership of vehicles, real estate, telephones, and other assets in nominee names and register utility services in nominee names to avoid law enforcement detection.

*RR*

Subject Premises

5. The following information is based upon my personal knowledge, as well as information provided by other federal officers and is presented as probable cause to seek issuance of a search warrant allowing agents to enter and conduct a search of a property located at 7991 Grouse Run Dr., Las Cruces, New Mexico 88012 (the Subject Premises), more fully described in Attachment A, which is the residence of Juan MADRID-Pinon.

Probable Cause

6. This Affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Facts presented in this Affidavit are based on my knowledge, observations, and direct participation in this investigation, as well as through conversations with other agents and/or persons involved in the investigation, and through the review of reports, and other documentation generated by myself and others during the course of this investigation and other related investigations.

7. The following information is presented as probable cause to search the Subject Premises. Because this Affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every known fact regarding the instant investigation. More specifically, I have set forth only pertinent facts that I believe are necessary to establish probable cause to search the Subject Premises for evidence of violations of 21 U.S.C. §§ 841(a)(1) and 21 U.S.C. §846.

8. The LCSF is currently investigating MADRID-Pinon and co-conspirators in the Las Cruces and El Paso areas. As a result of an ongoing investigation, agents have learned that MADRID-Pinon is a cocaine distributor who is based in the Las Cruces area. Upon further investigation, agents were able to identify vehicles utilized by MADRID-Pinon and co-conspirators to conduct their cocaine dealing.

*RR*

9. Multiple surveillance operations show that MADRID-Pinon resides at the at the Subject Premises. Surveillance operations also show that the vehicles utilized by MADRID-Pinon to conduct drug transactions are present at the Subject Premises at various times of the day to include early morning and late-night hours.

10. On March 30, 2023, LCSF agents conducted an undercover operation with MADRID-Pinon in which MADRID-Pinon sold one ounce of cocaine to an HSI undercover agent (UCA) for $1,400 dollars. Prior to the transaction, LCSF agents established physical surveillance at the Subject Premises. During surveillance, agents observed MADRID-Pinon exit the subject premises, and enter a white Cadillac Escalade sport utility vehicle (SUV) parked inside the curtilage of the Subject Premises. Agents then observed MADRID-Pinon and a co-conspirator depart the Subject Premises and travel directly to meet with the UCA where the transaction was conducted. During the undercover meeting, MADRID-Pinon told the UCA that he had access to, and could sell kilogram quantities of cocaine.

11. On April 14, 2023, LCSF agents applied for and received a tracking warrant to place a tracking device on the Cadillac Escalade that MADRID-Pinon utilized to conduct the transaction of one ounce of cocaine on March 30, 2023. LCSF agents installed the tracking device on the vehicle on April 19, 2023.

12. On April 23, 2023, LCSF agents conducted a second undercover operation with MADRID-Pinon in which MADRID-Pinon sold three ounces of cocaine to the UCA for $4,200 dollars. During this operation, MADRID-Pinon Prior arrived in a maroon Infinity QX56 SUV and conducted counter-surveillance while MADRID-Pinon's co-conspirator, later identified as Jose VILLALOBOS-Gutierrez, arrived in the Cadillac Escalade to meet with the UCA and conduct the transaction. LCSF agents monitored the tracker which showed the Cadillac Escalade was at the Subject Premises just minutes prior to the undercover operation. Furthermore, during negotiations between the UCA and

RR

RR

MADRID-Pinon prior to the meeting, MADRID-Pinon told the UCA that he wanted to conduct the transaction as soon as possible because he did not want to have the cocaine at the Subject Premises for too long around his children.

13. Throughout May and June of 2023, and the first part of July 2023, the HSI UCA has maintained communication with MADRID-Pinon to negotiate kilogram quantities of cocaine. During the recorded communications, MADRID-Pinon has told the UCA that MADRID-Pinon has access to several kilograms of cocaine. MADRID-Pinon agreed to sell five kilograms of cocaine to the UCA for a price of $115,000 dollars. Specifically, on June 12, 2023, MADRID-Pinon told the UCA that he would attempt to obtain the five kilograms of cocaine from the source of supply and have the cocaine in his possession prior to the UCA meeting with MADRID-Pinon. On July 10, 2023, MADRID-Pinon telephonically contacted the UCA to tell him he previously had five kilograms of cocaine but had to sell two kilograms. MADRID-Pinon added that he had three kilograms of cocaine readily available to sell to the UCA at the same price previously negotiated which was $23,000 per kilogram. The UCA agreed to meet with MADRID-Pinon on July 11, 2023, to conduct the transaction of the three kilograms of cocaine.

14. On July 11, 2023, LCSF agents conducted an undercover operation. During the morning of July 11, 2023, MADRID-Pinon told the UCA that he wanted to meet at the Lowe's Home Improvement store in Las Cruces. Prior to UCAs meeting with MADRID-Pinon, a DEA air unit assisting with surveillance was monitoring the Subject Premises. Shortly after MADRID-Pinon told the UCA that he wanted to meet at Lowe's Home Improvement, the DEA air unit observed two vehicles depart in tandem from the Subject Premises. One of the vehicles was the white Cadillac Escalade and the second vehicle was a black Chevrolet Silverado pick-up truck. The DEA air surveillance unit maintained constant visual of the two vehicles. Both vehicles traveled from the Subject Premises directly to the Lowe's Home Improvement Store. LCSF and two UCAs traveled to a predetermined

RR

location. The UCA contacted MADRID-Pinon and asked him to meet at a different (predetermined) location than Lowe's Home Improvement. MADRID-Pinon agreed. The DEA air unit continued maintaining constant surveillance of the Cadillac Escalade and the Chevrolet Silverado. Both traveled directly from the Lowe's Home Improvement to the pre-determined location. Once both vehicles arrived at the predetermined location, ground surveillance agents observed MADRID-Pinon exit the Chevrolet Silverado and enter the Cadillac Escalade. With the UCA telephonically communicating with MADRID-Pinon, the Cadillac Escalade proceeded to park next to the UCA vehicle. The two UCAs met with the two subjects occupying the Cadillac Escalade. The driver was identified as VILLALOBOS-Gutierrez. The two UCAs asked MADRID-Pinon where the cocaine was and MADRID-Pinon directed one of the UCAs to look inside a cardboard box that was in the front driver seat of the Cadillac Escalade. The UCA observed three brick-shaped packages wrapped in black tape inside a cardboard box. Agents converged on the scene and secured all subjects. The substance in the packages field tested positive for the characteristics of cocaine with a gross weight of approximately 3.6 kilograms.

## ELECTRONIC STORAGE & FORENSIC ANALYSIS

15. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. This information can sometimes be recovered with forensics tools.

16. **Forensic evidence.** As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how any seized cellular telephone or other electronic device was used, the purpose of its use, who used the Device, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

a. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

b. A person with appropriate familiarity with how an electronic device works and the data generated by such devices may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

c. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

d. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

17. **Nature of examination.** Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

## Conclusion

18. Based on the foregoing, I submit that this Affidavit supports probable cause for a warrant to search the Subject Premises described in Attachment A and seize evidence of violations of 21

Page 10 of 11

*RR*

U.S.C. §§ 841(a)(1) and 846 (distribution and possession with intent to distribute a controlled substance, and conspiracy to do the same) described in Attachment B.

Respectfully submitted,

Rene Robles
Special Agent
Homeland Security Investigations

Electronically submitted and telephonically sworn to before me on July 11, 2023.

Damian L. Martinez
United States Magistrate Judge